UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO.:  5:25-CV-80-BJB

LIAM TRAUBE                                                                                    PLAINTIFF


**COMPLAINT**

v.

**DEMAND FOR TRIAL BY JURY**


CITY OF MURRAY, KENTUCKY
d/b/a Murray Police Department;
      Serve:  Bob Rogers, Mayor
             500 Main Street
             Murray, KY 42071

GRIFFIN DEESE
in his official and individual capacities;

DUSTIN BEVIL
in his official and individual capacities;

JAY HERNDON,
in his official and individual capacities;

ANGEL CLERE
in her official and individual capacities; and

SAMUEL BIERDS                                                                       DEFENDANTS
in his official and individual capacities

_____


      Plaintiff, Liam Traube, by and through the undersigned counsel, for his Complaint herein,

states as follows:

## PARTIES

1.  Plaintiff, Liam Traube ("Traube"), at all times relevant herein, is and was a resident of the State of Maryland, Fredrick County.

2.  Defendant, City of Murray, Kentucky ("Murray") is a "home rule" class city and municipal government located in Calloway County, Kentucky, and is a political subdivision of the Commonwealth of Kentucky.

3.  Murray operates the Murray Police Department ("MPD").

4.  Defendant Griffin Deese ("Deese") was at all times relevant hereto a police officer with the MPD and employed by Murray.

5.  Defendant Dustin Bevil ("Bevil") was at all times relevant hereto a police officer with the MPD and employed by Murray, with the rank of sergeant.

6.  Defendant Jay Herndon ("Herndon") was at all times relevant hereto a police officer with the MPD and employed by Murray, with the rank of captain.

7.  Defendant Angel Clere ("Clere") was at all times relevant hereto a police officer with the MPD and employed by Murray, with the rank of major.

8.  Defendant Samuel S. Bierds ("Bierds") was at all times relevant hereto a police officer with the MPD and employed by Murray, with the rank of captain, and is the Chief of Police of MPD.

9.  At all times relevant hereto, Deese, Bevil, Herndon, Clere, and Bierds were each acting in their capacities as police officers of MPD (with their respective ranks) and under color of law.

## JURISDICTION AND VENUE

10.     Plaintiff is authorized to bring the claims in this action by 42 U.S.C. § 1983, Kentucky

        law, and the general legal and equitable powers of this Court.

11.     This Court has original jurisdiction over the claims in this action authorized under 42

        U.S.C. § 1983 pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction

        over the state law claims in this action pursuant to 28 USCS § 1367.

12.     On information and belief, all of the Defendants in this action reside within the Western

        District of Kentucky. Most or all of the events or omissions giving rise to the claims

        herein occurred in Calloway County, Kentucky, which is assigned to the Paducah Jury

        Division.

13.     Venue is appropriate under 28 U.S.C. § 1391(b) because a substantial part of the events

        or omissions giving rise to Plaintiff's claims occurred in this judicial district.

## STATEMENT OF FACTS

14.     On December 31, 2024, Plaintiff was a customer at "Tap 216," a restaurant and bar

        located at 216 North 15th Street, Murray, Kentucky ("Tap 216"). Plaintiff went to Tap

        216 with friends, to celebrate the New Year.

15.     At approximately 1:27 a.m. on January 1, 2025, Ben Ballard ("Ballard," who, on

        information and belief, is a manager and/or owner of Tap 216), called MPD and/or 911

        and talked to Dispatch. Ballard requested police enter on the Olive Street side of Tap 216.

16.     Ballard reported that a man had started a fight on the side of Tap 216, that the man he had

        fought with had already left, and that the man was at that time "trying to fight the staff"

        of Tap 216.

17.     Dispatch asked Ballard what the man was wearing. Ballard said "he's got like a flannel

on with like a vest, and either slacks or jeans, and I th—I'm pretty sure he's got a hat on." Ballard reported that the man was white.

18.    Dispatch placed a radio call to responding officers at approximately 1:29 a.m. and relayed Ballard's request. Dispatch indicated that the subject about whom the call was made was "going to be wearing a flannel with a vest, a hat, going to be a white male."

19.    Approximately two minutes later, approximately 1:31 a.m., Deese, along with officer Mairkqus Thompson ("Thompson") arrived at Tap 216.

20.    Upon arrival at Tap 216, Deese and Thompson did not see the man described by Ballard.

21.    Upon arrival at Tap 216, Deese and Thompson did not see a man that fit the description that they had been given by Dispatch.

22.    Upon arrival at Tap 216, Deese and Thompson were met by a man who did not identify himself—and whom Deese and Thompson did not know—and who said only "he's going up around the building down the alleyway now."

23.    The man who met Deese and Thompson at Tap 216 was not Ballard, but was another employee of Tap 216. However, it was not until later that Deese and Thompson learned that the man was an employee of Tap 216.

24.    Without asking any more questions, Deese and Thompson took off running in the direction described by the employee who met them.

25.    After running for approximately 15 seconds in the direction that the employee indicated, Deese saw Traube and yelled "Hey, stop!" Deese did not at that time identify himself as a police officer.

26.    Approximately 3-4 seconds after yelling "Hey, stop!" Deese yelled "Stop running now!" Deese did not identify himself as police this time, either.

27.    Thompson then yelled "Murray Police, stop [unintelligible]!"

28.    Deese and Thompson kept running toward Traube.

29.    Traube was not wearing a vest.

30.    Traube was not wearing a hat.

31.    Deese and Thompson could not see what kind of shirt Traube was wearing, because Traube was wearing a coat over his shirt.

32.    Deese and Thompson could not see whether the person they were yelling at was white.

33.    Traube was not running. At the very least, Traube stopped running immediately after Thompson identified himself as police.

34.    After Thompson identified himself as Murray Police, Traube can be seen on Deese's body-worn camera ("BWC") video turning to face Deese and Thompson and raising his hands in surrender.

35.    Approximately three seconds after Thompson identified himself as police and commanded Traube to stop, Deese tackled Traube while running at full force, striking Traube with the force and weight of Deese's body and with the momentum Deese had from running at full force toward Traube.

36.    Traube was not running when Deese ran into him at full force.

37.    Deese and Thompson did not ask Traube any questions or give him any reasonable chance to converse with them before Deese tackled Traube.

38.    Deese struck Traube's body, tackling him to the ground, hitting him so hard that he knocked him out of one of his shoes, and caused Traube to hit his head on the sidewalk. The force of his head slamming against the concrete cracked Traube's skull and inflicted a serious and traumatic brain injury. Traube was immediately knocked unconscious and

large amounts of blood immediately began pouring from his right ear. MPD BWC

footage captured Traube's limp body after Deese tackled him.









39.     Deese and Thompson did not know—and could not have known—whether Traube was the person about whom Ballard had called Dispatch. In fact, on information and belief, including the description that Ballard gave to Dispatch, Traube was not the person about whom Ballard called Dispatch.

40.     Deese and Thompson did not actually believe Traube to be armed.

41.    Deese and Thompson did not reasonably believe Traube to be armed.

42.    Deese and Thompson did not actually believe Traube to be dangerous.

43.    Deese and Thompson did not reasonably believe Traube to be dangerous.

44.    Neither Deese nor Thompson witnessed Traube commit any crime.

45.    Traube was not causing any substantial risk of physical injury to any person while he was walking away from Tap 216. In the alternative, even if Traube was running away from Officers Deese and Thompson, his doing so did not create any substantial risk of physical injury to any person.

46.    Deese tackled Traube even though neither Deese nor Thompson had spoken to any witness who claimed to have actually witnessed Traube commit any crime.

47.    Traube was taken by ambulance to Murray-Calloway County Hospital. Traube was later flown by medical helicopter to Vanderbilt University Adult Hospital in Nashville, TN.

48.    Several MPD officers, including Deese, went to Murray-Calloway County Hospital when Traube was taken there.

49.    Defendants were all on notice of the severity of Traube's injuries, because of the BWC video taken at the scene, and because of—among other things—BWC video recorded by MPD officers at the hospital and additional photographs taken by MPD while he was there, including the following:



50.    The injuries Traube sustained from Deese tackling him were serious and severe injuries, including, but not limited to, a basilar skull fracture, traumatic intracranial bleeding, and traumatic brain injury.

51.    Traube suffered pain, and continues to suffer pain, resulting from Deese's unlawful and unreasonable use of force against Traube.

52.    Traube continues to require medical treatment for the injuries he sustained from Deese's unlawful and unreasonable use of force against Traube.

53.   After Traube was taken by ambulance to Murray-Calloway County Hospital, Deese charged Traube with two misdemeanors; namely, violation of KRS 222.202(1) (alcohol intoxication in a public place) and KRS 520.105 (fleeing or evading police, 3rd degree).

54.   Deese did not witness any conduct by Traube that would lead him to reasonably believe that Traube was "manifestly under the influence of alcohol" as required by KRS 222.202(1).

55.   Traube did not cause a substantial risk of physical injury to anyone in the approximately three-second period between Thompson's shout to Traube and Deese knocking Traube to the concrete.

56.   Deese did not witness any conduct by Traube that would lead him to reasonably believe that—in the three seconds after Thompson identified himself as a police officer before Deese tackled him and knocked him unconscious—Traube: (1) recognized Deese and/or Thompson to be peace officers; (2) knowingly or wantonly disobeyed the direction to stop; and (3) at any time in those three seconds Traube created a substantial risk of physical injury to any person, all of which are required in order to constitute a violation of KRS 520.105.

57.   In the Uniform Citation that Deese issued to Traube, Deese made (at least) the following misrepresentations:

a.   That Traube "refused to stop." In fact, the BWC video clearly shows that Deese and Thompson catch up to Traube easily, because he is not running away from them when they catch up to him. Even Deese says in the Uniform Citation that he tackled Traube "on the concrete path he was <u>standing</u> on." (emphasis supplied)

b.  That Traube "began throwing his hands at Officers while still moving away from us." In fact, the BWC video shows that Traube <u>raised</u> his hands in surrender once Thompson identified himself as police. Raising one's hands in surrender is not "throwing hands at" anyone.

c.  That Ballard said Traube was on Olive Boulevard fighting with a male over a female. In fact, Ballard said (after Traube was knocked unconscious) that he saw Traube and another person in an argument or fight, and that he was "<u>assuming</u> it was over a chick, because the chick was with the other guy." (emphasis supplied) Deese's characterization of Ballard's statements is misleading at best.

58.  A reasonably-competent police officer would not reasonably believe that Traube could be convicted of violations of KRS 222.202(1) or KRS 520.105 based upon the information available to Deese at the time he issued the criminal citation to Traube.

59.  Deese was well aware that tackling someone on concrete is dangerous and can result in serious bodily injury or death.

60.  Deese tackled Traube on the concrete, knowingly and willfully accepting the risk that his actions could hurt or even kill Traube.

61.  MPD has written policies, including (without limitation) those policies which are written in the MPD's Policy and Procedure Manual.

62.  MPD has a written "Response to Resistance" Policy.

63.  Deese, Thompson, Bevil, Herndon, Clere, and Bierds are all aware of the existence of the Response to Resistance Policy.

64.  Deese did not attempt any de-escalation as described in the Response to Resistance Policy.

65.    Deese's conduct in tackling Traube was plainly and obviously not in compliance with MPD's Response to Resistance Policy.

66.    Thompson witnessed Deese tackle Traube onto the concrete without attempting any de-escalation, and without attempting to engage in a conversation with Traube to determine whether any probable cause to arrest or charge Traube existed.

67.    Thompson knew based upon Dispatch's radio call to MPD officers that Ballard had called about a white male wearing a flannel, a vest, and a hat. Before Deese tackled Traube, Thompsons did not see:

    a.    Whether Traube was white;

    b.    Traube wearing a hat;

    c.    Traube wearing a vest; or

    d.    Traube wearing flannel.

68.    Thompson witnessed Deese tackle Traube onto the concrete while Traube was standing, and not trying to get away from officers Deese and Thompson.

69.    Thompson witnessed Deese tackle Traube onto the concrete while Traube had his hands in the air in surrender.

70.    Thompson knew that Deese used excessive force against Traube.

71.    Thompson did not report Deese's unlawful conduct, as required by MPD's Duty to Intervene and Response to Resistance policies.

72.    Bevil drafted a memorandum to Bierds, Herndon, and Clere. Bevil drafted a narrative of his version of what can be seen on Deese's BWC video, which includes the following misrepresentations:

a.  That the BWC video shows that "an employee of the business…points out the male in question." In fact, the employee only indicated generally the direction he said the man went, but neither the employee nor Deese could see the area where the employee said the man went from where they stood, so the employee cannot be said to have pointed out any particular person.

b.  That "[t]he employee stated to Officer Deese that Traube was running around the back side of the business…" In fact, the employee never indicated that anyone was "running." Instead, he said that "he's <u>going</u> up around the building down the alleyway now."

c.  That Traube failed to comply with Deese's commands and "continues running northbound away from officers." In fact, even if Traube did fail to comply with Deese's commands (which is denied), one cannot see Traube running on the BWC.

d.  That "Once Officer catches up to [Traube], Officer Deese grabs him from behind and assists him to the ground…" In fact, Traube is seen on BWC turning toward Deese right before Deese tackled him, and Deese did not "assist" Traube to the ground. No reasonable person would describe Deese's actions in tackling Traube while running at him at full force to be any attempt at "assisting" Traube in any way.

e.  That "Officer Deese followed Murray Police Department policy and ended the foot pursuit with the least amount of force necessary to affect the arrest of Traube." In fact, there was not even an attempt to use less force to arrest Traube, and MPD's arrest of Traube was unlawful anyway, because MPD officers did not

witness him commit any crimes. Even when MPD talked to Ballard later, Ballard did not claim to have personally seen Traube commit any crime; accordingly, there was not a single actual witness upon whose statements MPD could rely in arresting Traube.

73. Deese and/or one or more other officers with MPD prepared answers to a "Response to Resistance Investigation Report" on a form intended to be submitted to the Kentucky State Police Internal Affairs Branch (the "KSP Investigation Report").

74. The KSP Investigation Report indicates that Traube used "less lethal force" against Traube. This was false. In fact, Traube used no force at all against Deese or anyone else before Deese knocked him unconscious.

75. Herndon reviewed Deese's BWC footage and was therefore aware that Deese tackled Traube only three seconds after Thompson first identified himself and Deese as police. Herndon nevertheless indicated on the KSP Investigation Report that even after watching the BWC video, he "observed no violation of MPD policy or Kentucky statute." In fact, Herndon witnessed Deese tackle an unarmed man who was not believed to be armed, was not engaged in any crime, and who did not even fit the description of the subject who was reported to Deese.

76. Clere indicated on the KSP Investigation Report that Deese's actions were "in full compliance with both Murray Police Department policy and Kentucky Revised Statutes." In fact, Deese's actions were not in compliance with MPD's written policies.

77. Bierds indicated on the KSP Investigation Report that Deese's actions were "in compliance with policy and KRS."

78.    Any finding, conclusion, or determination that Deese's conduct was in compliance with MPD's Response to Resistance Policy made by any representative of MPD with full knowledge of the pertinent facts was in bad faith, and was merely an attempt to conceal Deese's unlawful actions.

79.    Bevil, Herndon, Clere, Bierds, and Murray each and all ratified Deese's conduct with regard to Traube, including his use of force against Traube.

80.    Deese, Bevil, Herndon, Clere, and Bierds each made statements in writing about Deese's and/or Traube's actions which were objectively false.

81.    Even though MPD has written policies, MPD has a history of condoning and ratifying officer conduct which is objectively contrary to those written policies.

82.    On multiple occasions prior to January 1, 2025, MPD has condoned an officer's use of force against a person when the person does not comply with the officer's directions, even when there does not exist probable cause to arrest the person.

83.    In 2024, half of the incidents in which MPD documented any use of force by MPD officers resulted in some injury to the person against whom the force was directed.

84.    It is not a crime in Kentucky for a pedestrian to evade or elude police officers, even when he or she knows that they are police officers, unless the act of fleeing or eluding causes a substantial risk of physical injury to someone or results in actual injury.

85.    On multiple occasions prior to January 1, 2025, MPD condoned an officer's use of force against a pedestrian who was perceived by the officer to be fleeing the officer, even when there did not exist any probable cause to arrest the person for any other crime and the person was not creating any substantial risk of injury to any person while fleeing or eluding.

86. Under MPD's written Disciplinary Process Policy, an officer's use of excessive and/or unnecessary force is designated a Category III offense which merits suspension or dismissal at a single occurrence.

87. MPD did not suspend, reprimand, re-train, or discipline Deese in any way, or otherwise discourage Deese's actions toward Traube on January 1, 2025.

88. In fact, MPD further ratified Deese's actions on January 1, 2025 by naming him "Officer of the Quarter" for Quarter 1 of 2025, which began on January 1, 2025, the day that he tackled Traube.

89. With no hint of irony whatsoever, when MPD declared Deese to be the "Officer of the Quarter," MPD awarded Deese a belt that is styled after the championship belts awarded for boxing, mixed martial arts, and professional wrestling. The belt was even emblazoned with the word "Champion." MPD announced the fact that Deese was named "Officer of the Quarter" on Facebook, and posted the following photo of Deese and Bierds with the announcement:



90.    A reasonable person (including other MPD police officers) would interpret MPD's use of

a belt like the one pictured in Paragraph 89 as a trophy for being recognized as "Officer

of the Quarter" as a tacit endorsement of police officers' use of physical force against

others.

## Count I - 42 U.S.C. § 1983
## Violation of Fourth Amendment (Excessive Use of Force):
(against Deese)

91.     Prior to any physical contact between Deese and Traube, Traube was not under arrest.

92.     Prior to any physical contact between Deese and Traube, Traube was non-violent.

93.     Traube's actions on the sidewalk, whether walking or running, were not actions that constituted the crimes of resisting arrest or fleeing or evading police.

94.     Deese's action in tackling Traube while Traube was standing and while Deese was running full force at Traube was an objectively unreasonable use of force.

95.     Deese's actions in tackling Traube while Traube was standing and while Deese was running full force at Traube was an unjustified and excessive use of force.

96.     It is well-established that a non-violent, non-resisting, or only passively-resisting suspect who is not under arrest has a right to be free from an officer's use of force.

97.     Deese's escalation to the use of physical force against Traube was without justification and did not follow MPD's written policies and procedures.

98.     Deese's escalation to the use of physical force against Traube was objectively unreasonable.

99.     Deese's use of physical force against Traube was an excessive use of force.

100.    Deese violated Traube's well-established Fourth Amendment right to be free from excessive force when Deese used excessive force that was objectively unreasonable on Traube.

### Count II – 42 U.S.C. § 1983
### *Monell* **(Excessive Use of Force)**
(against Murray)

101.    Murray and Murray's officers, including, without limitation, the Mayor, the City Council, and the Chief of Police have the power, authority, and responsibility to adopt and oversee policies, procedures, and practices for MPD.

102.    Murray has a duty to ensure that the policies, procedures, and practices of MPD are adequate and appropriate to reasonably protect the life, health, safety, and welfare of Murray's citizens who interact with law enforcement in the course of carrying out their policing duties.

103.    Murray and Murray's officers, including, without limitation, the Mayor, the City Council, and the Chief of Police have a duty to ensure that officers follow the policies and procedures of MPD which have been adopted in order to reasonably protect the life, health, safety, and welfare of Murray's citizens who interact with law enforcement.

104.    Murray and Murray's officers, including, without limitation, the Mayor, the City Council, and the Chief of Police have a duty to discipline and/or remove police officers who fail to follow MPD's written policies.

105.    It was MPD's custom and practice to ignore its own written policies and procedures, and this custom and practice directly contributed to the use of excessive force against Traube in violation of his constitutional rights.

106.    It was Murray's custom and practice to allow MPD to ignore its own written policies and procedures, because Murray failed to adequately train, supervise, control, and discipline the personnel under its supervision. MPD's custom and practice of allowing MPD to

ignore its own written policies and procedures directly contributed to the use of excessive

force against Traube in violation of his constitutional rights.

107. Despite the fact that MPD and Murray had written policies that—if followed—would

have prevented the unlawful conduct at issue in this case, it was the actual, factual

custom of Murray, MPD, and Bierds to ignore those written policies.

108. Without limitation, it was and is the custom and practice of MPD and Murray to ratify

and approve of unlawful excessive use of force by MPD police officers, even when there

existed BWC video or other conclusive evidence that officers' use of force was unlawful.

109. Without limitation, it was and is the custom and practice of MPD and Murray to

encourage a culture within the MPD that embraces the use of physical force to subdue

subjects, by (among other things):

   a. holding out officers as examples for others by naming them "Officer of the

      Quarter" even when those officers are known to have used excessive force; and

   b. using a championship-style belt typically associated with boxing, mixed martial

      arts, or wrestling as an emblem to be awarded to officers whose conduct is

      recognized as exemplary.

110. Each of Bevil, Herndon, Clere, and Bierds, while acting in their official capacities,

reviewed Deese's actions and use of force against Traube, and each of them endorsed

those actions as being in accordance with MPD's policies.

111. Each of Bevil, Herndon, Clere, and Bierds, while acting in their official capacities,

reviewed Deese's actions and use of force against Traube, and ratified Deese's unlawful

conduct.

112. As Chief of Police, Bierds was the official with the final decision-making authority with regard to the investigation and review of Deese's actions, and his ratification of Deese's actions constitutes ratification by Murray for purposes of *Monell* liability.

113. It was Murray's policies, practices, or customs (among other things, its custom of allowing its police officers to ignore MPD's written Response to Resistance Policy) that directly led to the violation of Traube's constitutional rights.

114. The customs, policies, and practices of MPD were maintained and implemented by Murray with deliberate indifference to Traube's constitutional rights, and the constitutional rights of others similarly situated.

**Count III – 42 U.S.C. § 1983**
**Supervisory Liability**
(against Bevil, Herndon, Clere, and Bierds)

115. Each of Bevil, Herndon, Clere, and Bierds, while acting under color of law, engaged in a pattern of encouraging unlawful and excessive use of force by MPD officers by, among other things, adopting and following a custom of avoiding meaningful and objective review of police officers' use of force, and ratifying and endorsing that conduct, even when it was objectively unreasonable.

116. Each of Bevil, Herndon, Clere, and Bierds, while acting under color of law, reviewed Deese's actions and use of force against Traube, and each of them endorsed those actions as being in accordance with MPD's policies.

117. Each of Bevil, Herndon, Clere, and Bierds, while acting under color of law, embraced a culture within the MPD that glorified and promoted the use of force by police officers, even in situations where it was not warranted.

118.    Each of Herndon, Clere, and Bierds, while acting under color of law, at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of each and every police officer under his or her supervision, including (without limitation) the unconstitutional conduct of the MPD personnel under their supervision, which personnel in turn engaged in unconstitutional authorization, promotion, acquiescence, or ratification of the unconstitutional actions of other officers under their respective supervision.

119.    Each of Bevil, Herndon, Clere, and Bierds, while acting under color of law, at least implicitly authorized, approved, or knowingly acquiesced in Deese's unconstitutional conduct.

120.    Each of Bevil, Herndon, Clere, and Bierds, while acting under color of law, engaged in deliberate indifference to Traube's constitutional rights, and in tacit or implicit authorization of Deese's unconstitutional conduct.

121.    Each of Bevil, Herndon, Clere, and Bierds, while acting under color of law, failed to take precautions against likely violations of Traube's constitutional rights.

## STATE LAW CLAIMS

### Count IV – Common Law Battery
(against Deese)

122.    Deese intentionally touched Traube, without Traube's consent.

123.    Deese intentionally tackled Traube without Traube's consent.

124.    Deese did not have any legitimate reason to touch Traube.

125.    Deese did not have any legitimate reason to tackle Traube.

126.    Deese knew that his actions in tackling Traube were unjustified and unlawful, and he did it anyway.

127. Deese acted with malice toward Traube, and with reckless indifference to his rights, when he tackled Traube and caused him to strike his head against the concrete.

128. Deese willfully and wantonly disregarded Traube's rights.

129. Traube suffered damages as a result of Deese's unlawful conduct.

130. Traube is entitled to recover his actual damages from Deese, and to recover punitive damages from Deese, in an amount sufficient to punish Deese for his battery of Traube, and to deter Deese and others similarly situated from engaging in such conduct in the future.

### Count V – Negligence and Gross Negligence
(against Deese)

131. Deese owed Traube a duty to ensure that any of Deese's actions toward Traube would be consistent with the actions that a reasonable, competent police officer would direct toward Traube under similar circumstances.

132. Deese owed Traube a duty to ensure that Deese did not take any actions toward Traube that would result in an unreasonable risk of injury to Traube.

133. Deese owed Traube a duty to ensure that Deese was at least as familiar with applicable policies and procedures of MPD as another reasonably competent police officer would be.

134. Deese breached his duty to Traube by acting in an outrageous and unreasonable manner when he ran into and tackled Traube when (among other things):

   a. Traube did not match the description of the person about whom the service call was made;

   b. Deese did not witness Traube commit any crime;

    c.   Deese did not have any probable cause to believe that Traube had committed any crime;

    d.   Deese did not attempt to converse with Traube to ascertain whether Traube had committed any crime or whether any detention or arrest of Traube was warranted;

    e.   Deese did not believe Traube to be armed; and

    f.   Deese did not believe Traube to be dangerous.

135.   Deese breached the duty he owed to Traube when he ran into him and tackled him on concrete, knowing that he was risking the possibility of serious injury or risk to Traube.

136.   Deese violated KRS 431.025 when he used unreasonably force or violence against Traube. Deese's actions were negligent per se, pursuant to (without limitation) KRS 431.025.

137.   Deese's actions caused serious and painful injuries to Traube, including injuries for which he continues to seek medical treatment.

138.   Deese acted with malice toward Traube, and with reckless indifference to his rights, when he tackled Traube and caused him to strike his head against the concrete.

139.   Deese willfully and wantonly disregarded Traube's rights.

140.   Traube is entitled to recover his actual damages from Deese, and to recover punitive damages from Deese, in an amount sufficient to punish Deese for his negligent conduct, and to deter Deese and other similarly situated from engaging in such conduct in the future.

## Count V – Negligence and Gross Negligence
(against Murray, Bevil, Herndon, Clere, and Bierds)

141.    Murray, Bevil, Herndon, Clere, and Bierds each owed Traube a duty to ensure that MPD hired and retained reasonably competent individuals to serve as police officers of MPD.

142.    Murray, Bevil, Herndon, Clere, and Bierds each owed Traube a duty to adequately train MPD's police officers to ensure that they were reasonably familiar with the provisions of law that govern the discharge of police officers' duties under the law, and MPD's own standard operating procedures, including (without limitation), its Policy and Procedure Manual.

143.    Murray, Bevil, Herndon, Clere, and Bierds each owed Traube a duty to supervise each and every police officer under their respective supervision, to ensure that those police officers acted—and were required to act—in the manner in which reasonably competent police officers would act. Without limitation, this means that:

   a.    Murray owed Traube a duty to reasonably supervise Bierds, Clere, Herndon, Bevil, and Deese;

   b.    Bierds owed Traube a duty to reasonably supervise Clere, Herndon, Bevil, and Deese;

   c.    Clere owed Traube a duty to reasonably supervise Herndon, Bevil, and Deese;

   d.    Herndon owed Traube a duty to reasonably supervise Bevil and Deese; and

   e.    Bevil owed Traube a duty to reasonably supervise Deese.

144.    Murray, Bevil, Herndon, Clere, and Bierds each breached the duty they owed to Traube by:

   a.    Failing to supervise the police officers under their respective supervision;

     b.  Failing to require police officers under their respective supervision to know and follow MPD's written Policies and Procedures;

     c.  Failing to initiate discipline and/or termination of employment of police officers under their respective supervision who were known to them to violate MPD's written Policies and Procedures; and

     d.  Failing to meaningfully and objectively investigate and review the incidents involving use of force by police officers to ensure that said use was lawful and in compliance with MPD's written Policies and Procedures.

145.   Murray, Bevil, Herndon, Clere, and Bierds each acted with malice toward Traube, and with reckless indifference to his rights.

146.   Murray, Bevil, Herndon, Clere, and Bierds each willfully and wantonly disregarded Traube's rights.

147.   Murray, Bevil, Herndon, Clere, and Bierds are each liable to Traube for the damages he sustained as a result of their negligent conduct.

148.   Murray is vicariously liable for the negligent actions of Bevil, Herndon, Clere, and Bierds.

149.   Murray is directly liable to Traube for its own negligent hiring, training, and supervision of the peace officers in its employ, including (without limitation), Deese, Bevil, Herndon, Clere, and Bierds.

150.   Traube suffered damages as a direct and proximate result of the negligence of each of Murray, Bevil, Herndon, Clere, and Bierds.

151.   Traube is entitled to recover his actual damages from Murray, Bevil, Herndon, Clere, and Bierds, and to recover punitive damages against each of these Defendants, in an amount

sufficient to punish each of these Defendants for their unlawful conduct, and to deter each of them and others similarly situated from engaging in such conduct in the future.

## Count VI – Abuse of Process
(against Deese and Murray)

152. Deese initiated a criminal legal process against Traube, by and through the issuance of a criminal citation to Traube, charging him with the violation of two crimes.

153. Deese did not issue the criminal citation to Traube because he had probable cause to believe the Traube had committed any crime, let alone the crimes with which he was charged in the criminal citation.

154. Deese issued the criminal citation to Traube willfully and for a purpose other than that for which the legal process was designed; namely, Deese issued the criminal citation:

   a. In an attempt to make his own unconstitutional and tortious actions against Traube appear to be reasonable, and to legitimize his own actions; and

   b. To deter Traube from initiating a civil cause of action against Deese, MPD, or Murray for the injuries he sustained as a result of Deese's conduct.

155. As a result of Deese's issuance of the criminal citation, Traube suffered damages, including (but not limited to) legal fees, humiliation, embarrassment, mental anguish, and damage to reputation.

156. Murray is vicariously liable for Deese's actions in issuing the criminal citation, as Deese's issuance of the criminal citation (and, more particularly, the duty not to issue a citation for which there was no probable cause) was a ministerial act.

157.    On information and belief, Murray also promoted the issuance of the citation for improper purposes similar to those of Deese, and in ways which are not now known, but which may established in discovery in this matter and shown at trial.

158.    Traube is entitled to recover from Deese and Murray for his actual damages sustained as a result of their unlawful abuse of process against him, and for punitive damages in an amount to punish Deese and Murray for their unlawful conduct, and to deter them and others similarly situated from engaging in such conduct in the future.

**WHEREFORE**, Plaintiff respectfully demands the following:

1.    Judgment against Defendants, and in favor of Plaintiff to compensate Plaintiff for his actual damages and losses sustained as a result of Defendants' unlawful conduct, including damages for:

    a.    Past and future medical bills and expenses required to treat Plaintiff for the injuries he sustained;

    b.    Past and future physical pain and suffering;

    c.    Past and future emotional distress;

    d.    Humiliation and embarrassment; and

    e.    Damage to reputation.

2.    Punitive damages against the individual Defendants for their willful and grossly negligent conduct in violation of the Plaintiff's well-established constitutional rights, allowed pursuant to 42 U.S.C. § 1983;

3.    Punitive damages against the individual Defendants for their common law and statutory claims under Kentucky law;

4. For Plaintiff's costs and expenses incurred in connection with this Action, including, but not limited to, reasonable attorney's fees pursuant to 42 U.S.C. § 1983;

5. Pre-judgment and post-judgment interest on all amounts awarded herein;

6. Trial by Jury on all issues so triable; and

7. Any and all other relief to which Plaintiff may appear entitled.

Respectfully submitted,

/s/Joshua S. Harp
Joshua S. Harp (KY Bar No. 91386)
Rex Kilburn (KY Bar No. 100195)
Baughman Harp, PLLC
401 West Main Street, Suite 1
Frankfort, KY 40601
P.  502-227-2271
F.  502-352-2936
E.  harp@harplawoffice.com
*Counsel for Plaintiff*